UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x

HUMPHREY HUGH HALLADENE,

                       Petitioner,

      -against-

THOMAS DECKER, *in his official capacity as Director of the New York Field Office of U.S. Immigration & Customs Enforcement*; and CHAD WOLF, *in his official capacity as Acting Secretary, U.S. Department of Homeland Security*,

                       Respondents.

------------------------------------- x

MEMORANDUM DECISION
AND ORDER

20 Civ. 2883 (GBD)

GEORGE B. DANIELS, United States District Judge:

Petitioner Humphrey Hugh Halladene seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2241, challenging the lawfulness of his ongoing detention by Immigration and Customs Enforcement ("ICE"). (*See* Pet. for Writ of Habeas Corpus, ECF No. 1.) Petitioner challenges his detention as a violation of due process for two reasons. He argues that (1) Respondents have failed to provide him with adequate protection from COVID-19 and (2) Respondents have failed to provide him with adequate medical care, given his heightened risk of contracting COVID-19 and suffering serious harm. (*Id.* ¶¶ 69-76.)

On April 9, 2020, Petitioner moved for a preliminary injunction and temporary restraining order ordering Respondents to release him, subject to reasonable and appropriate conditions, and enjoining Respondents from arresting him for purposes of civil immigration detention "until such time as they can demonstrate that his detention would create no incremental risk of illness or death from COVID-19." (Pet'r's Mot. for Order to Show Cause and Prelim. Inj. and TRO, ECF No. 8.) Alternatively, Petitioner requested a bail hearing before this Court "where Respondents must

prove, by clear and convincing evidence, that Mr. Halladene's ongoing detention is necessary and does not violate his due process rights." (*Id.*) Petitioner's motion for a preliminary injunction and temporary restraining order is DENIED.

## I. BACKGROUND

Petitioner has been in ICE custody at Hudson County Jail ("HCJ")[1] in Kearny, New Jersey since October 2019. (Pet. ¶ 3.) He is being held pending removal proceedings, pursuant to ICE's discretionary authority under 8 U.S.C. § 1226(a). (*Id.* ¶ 5.) At HCJ, Petitioner shares a cell with another ICE detainee and uses common areas accessible to dozens of other detainees. (*Id.* ¶ 53.) The facility also houses federal and state inmates, and has a maximum capacity of 1400 inmates and 328 ICE detainees. (Fifth Am. Decl. of Director Ron Edwards ("Edwards Decl."), ECF No. 19-1, ¶ 3.) As of May 4, 2020, the total population was 687 individuals, including 123 ICE detainees. (*Id.*)

HCJ has not been immune to the ongoing COVID-19 global pandemic. As of 1:00 pm on May 4, 2020, HCJ identified thirteen ICE detainees who tested positive for COVID-19. (*Id.* ¶ 20.) Additionally, 27 county and federal inmates – who are housed separately from ICE detainees – have tested positive. (*Id.* ¶ 4, 20.) Further, 94 staff members have tested positive, of which four have tragically died from complications from COVID-19. (*Id.* ¶ 20-21.)

Petitioner is a 54-year-old man who suffers from a series of chronic medical conditions, including high blood pressure (hypertension) and high cholesterol. (Pet. ¶ 3, 4.) He has received medication for his hypertension while at HCJ. (*Id.* ¶ 52.) Additionally, he has a BMI of 30, *id.* ¶ 51, which renders him obese, though at the lowest end of the relevant range. (*See id.* ¶ 27.)

---

[1] Petitioner refers to the facility as Hudson County Jail, but Respondents refer to it as Hudson County Correctional Facility or Hudson County Corrections Center. This Court considers all references to Hudson County Jail, Hudson County Correctional Facility and Hudson County Corrections Center in the parties' submissions to be interchangeable.

Petitioner contends that these medical conditions and his age put him at "high risk of developing severe and potentially fatal complications from COVID-19." (*Id.* ¶ 48.)

## II. LEGAL STANDARDS

"[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (per curiam) (citation omitted). To obtain a preliminary injunction, the moving party must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."[2] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Additionally, where the proposed injunction "will alter rather than maintain the status quo the movant must show clear or substantial likelihood of success." *Wright*, 230 F.3d at 547 (citation and internal quotation marks omitted). "The standard[s] for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of [Civil] Procedure are identical." *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd.*, 190 F. Supp. 2d 577, 580 (S.D.N.Y. 2002); *see also Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) ("It is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction.").

---

[2] Petitioner argues that a preliminary injunction is also appropriate where petitioner demonstrates "irreparable harm and sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." (Mem. of Law in Supp. of Appl. for Order to Show Cause and Prelim. Inj. and TRO, ECF No. 9, at 4) (citations and internal quotation marks omitted). The Second Circuit has held that district courts may grant preliminary injunctions under the likelihood-of-success standard or the fair-ground-for-litigation standard. *See Wright v. Guiliani*, 230 F.3d 543, 547 (2d Cir. 2000). However, where "the moving party seeks a preliminary injunction that will affect 'government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard.'" *Id.* (citing *Beal v. Stern*, 184 F.3d 117, 122 (2d Cir. 1999)). Here, ICE is detaining Petitioner pursuant to a specific statute, 8 U.S.C. § 1226(a), under which Congress explicitly granted discretionary authority to detain individuals pending removal proceedings. Accordingly, Petitioner must meet the likelihood-of-success standard for a preliminary injunction.

3

### III. PETITIONER HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS OF HIS CLAIMS

The Eighth Amendment requires that the government provide for the basic needs of incarcerated individuals, including food, clothing, shelter, medical care, and reasonable safety. See *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). Though the Due Process Clause of the Fifth Amendment, rather than the Eighth Amendment, governs the treatment of federal civil detainees, the Supreme Court has extended the protections under the Eighth Amendment to civil detainees, reasoning that "persons in civil detention deserve at least as much protection as those who are criminally incarcerated." *Charles v. Orange Cty.*, 925 F.3d 73, 82 (2d Cir. 2019) (citing *Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

To establish a substantive due process violation regarding conditions of confinement, Petitioner must demonstrate that the government acted with deliberate indifference to the challenged conditions. See *Charles*, 925 F.3d at 85–86; *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). Specifically, Petitioner must show that the challenged conditions pose an unreasonable risk of serious damage to his health and the government acted with deliberate indifference to such conditions. See *Darnell*, 849 F.3d at 29-30.

#### A. Petitioner Has Not Demonstrated That Respondents Have Not Adequately Protected Him.

Petitioner alleges that Respondents have not adequately protected him from COVID-19. Specifically, he contends, *inter alia*, that HCJ has not implemented adequate screening or testing protocols; undertaken extensive sanitation measures required to fully disinfect the jail; or provided detainees with adequate sanitation supplies, food or medical attention. (Pet. ¶ 71.).

4

Respondents paint a very different picture. Respondents contend that during intake, detainees are given medical screenings, including a fever and respiratory illness assessment. (Decl. of Captain Jennifer Moon, ECF No. 13-2, ¶ 8.) Detainees with symptoms associated with COVID-19 are isolated for testing and potential treatment. (*Id.* ¶ 9.) Asymptomatic detainees with known exposure to a person confirmed to have COVID-19 are placed in "cohorts" with other similarly situated individuals for at 14-day incubation period and are monitored daily. (*Id.* ¶ 10.) HCJ has also instituted numerous measures throughout the facility to prevent the spread of COVID-19, including but not limited to: educating staff and detainees on the importance of hand washing and other best practices; conducting medical screenings of all staff and vendors entering the facility; ensuring adequate Personal Protective Equipment for staff; maintaining social distancing of detainees outside of their cells with staggered recreation times; sanitizing each housing unit at least three times per day; having medical staff visit each cell at least twice a day to check on the mental and medical health of each detainee; providing detainees with two bars of soap, with additional soap and disinfectant wipes available upon request, and unlimited access to water; providing detainees with surgical masks; and implementing protocols for staff who interact with high-risk detainees (i.e., detainees with health conditions identified by the CDC as putting them at a high risk of developing serious illness or death from COVID-19), including daily monitoring and requiring correctional officers who work with such detainees to use full PPE (i.e., suits, N95 masks, and gloves). (Edwards Decl. ¶¶ 11-13, 19, 25.) Additionally, HCJ claims that detainees "who report or show symptoms consistent with COVID-19 infection are immediately evaluated by medical staff." (*Id.* ¶ 14.)

Petitioner disputes whether HCJ has actually implemented the actions that Respondents claim to have taken to combat the COVID-19 pandemic. For example, Petitioner claims that he

has only had his temperature checked twice, despite repeated requests for additional monitoring. (Decl. of Amanda Bernardo in Support of Pet'r's Reply Brief in Further Support of Pet'r's Mot. for a Prelim. Inj. and Mot. to Show Cause, ECF 15-1, ¶ 5.). Approximately three weeks ago, Petitioner developed a cough and chills. (*Id.* ¶ 13.) He reported his symptoms to guards and requested to see a doctor. He also made repeated requests to the nurse who provides his daily hypertension medication to see a doctor or have his temperature checked. (*Id.*) Though he has since recovered, Petitioner received no medical attention when he was experiencing symptoms. (*Id.* ¶ 14.) Additionally, Petitioner alleges that HCJ has not conducted broad-based cleaning, disinfecting, or sanitizing of his housing unit. (*Id.* ¶ 5.) Petitioner has also been in direct proximity to other detainees who reported or were showing symptoms associated with COVID-19, including his cellmate. (*Id.*)

Petitioner and Respondents dispute key facts at issue in evaluating Petitioner's claim. Accordingly, this Court cannot conclude, based on the parties' submissions to date, that Petitioner is likely to succeed on the merits of his claim of inadequate protection.

**B. Petitioner Is Unlikely To Prove That Respondents Were Deliberately Indifferent To His Medical Needs.**

Petitioner also asserts that Respondents have acted with deliberate indifference to Petitioner's serious medical needs. In *Charles*, the Second Circuit delineated particular requirements for substantive due process claims alleging inadequate medical care. The detainee must establish "a serious medical need" and that the government "acted with deliberate indifference to such needs." *Charles*, 925 F.3d at 86. Deliberate indifference requires proving that Respondents "*knew* that failing to provide the complained of medical treatment would pose a substantial risk to [Petitioner's] health or that the [Respondents] *should have known* that failing to provide the omitted medical treatment would pose a substantial risk to [Petitioner's] health." *Id.*

at 87. Here, Petitioner contends that he has a high risk of developing severe illness from COVID-19 due to his underlying medical conditions, but Respondents have not taken any specific measures to address or mitigate his risk. (Pet. ¶ 53.) Respondents have implemented various protocols for preventing the spread of COVID-19 in HCJ, including procedures addressing the specific needs of high-risk detainees. *See supra* III.A. However, though Respondents are aware of Petitioner's medical conditions, they are not treating him as a high-risk detainee. (*See* Pet. ¶ 52-53; Mem. of Law in Opp'n to Mot. for TRO and Prelim. Inj., ECF No. 13, at 17.) Respondents identify high-risk detainees based on guidance from the CDC that delineates specific criteria for people who are at higher risk for severe illness from COVID-19. *See* Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19) – People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited May 5, 2020). The guidance is "[b]ased on currently available information and clinical expertise." *Id.* Notably, none of the specific conditions that Petitioner alleges – a BMI of 30, high cholesterol, hypertension, and being 54 years old – are identified by the CDC in this guidance.

To be sure, Petitioner's underlying conditions undoubtedly place him at increased risk of developing a serious case of COVID-19. Petitioner cites various sources that support this conclusion, including separate CDC guidance for clinicians caring for patients with confirmed cases of COVID-19, which notes that hypertension has been associated with "increased illness severity and adverse outcomes," as well as a higher fatality rate. Pet. ¶¶ 24-28; Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19) – Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last visited May 5, 2020). However, Respondents' decision to classify detainees as high risk

7

according to CDC criteria based on currently available information and clinical expertise was reasonable. Accordingly, Petitioner is unlikely to successfully prove that Respondents knew or should have known that not applying additional safety protocols to Petitioner would pose a substantial risk to his health.

## IV. CONCLUSION

Petitioner does not meet his burden for a preliminary injunction or temporary restraining order. Because Petitioner has not demonstrated that he is likely to succeed on the merits, this Court does not reach the other three factors to be examined for preliminary relief, namely irreparable harm, the balance of the equities and the public interest. Petitioner's motion for issuance of a preliminary injunction and temporary restraining order, (ECF No. 8), is DENIED. Additionally, Petitioner's request for a bail hearing is DENIED. The Clerk of Court is directed to close the motion accordingly.

Dated: New York, New York
      May 5, 2020

SO ORDERED.

*George B. Daniels*
GEORGE B. DANIELS
United States District Judge